IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL MALONE, on behalf of himself | : | |
| and others similarly situated, | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED PARCEL SERVICE, INC., | : | |
| *Defendant* | : | No.  21-3643 |

· **M E M O R A N D U M**

PRATTER, J.                                                               MAY 9, 2023

 Mr. Malone, on behalf of himself and others, filed this suit alleging that United Parcel Service, Inc. ("UPS") failed to pay compensation for time spent undergoing security screenings, walking from those screening to workstations, and using lockers at the screenings to don and doff steel-tipped boots, all in violation of the Pennsylvania Minimum Wage Act ("PMWA"). UPS now brings this motion to dismiss on the grounds that these claims are preempted by the federal Labor Management Relations Act ("LMRA"). But the LMRA only preempts state law claims that either arise under a collective bargaining agreement ("CBA") or require actual interpretation of such an agreement, rather than mere consultation. Because Mr. Malone's PMWA claims do not arise under a CBA, and because no interpretation of a CBA is necessary to determine if employees were paid overtime in accordance with the PMWA, these claims are not preempted. Therefore, the Court denies UPS's motion to dismiss.

BACKGROUND

 Mr. Malone is employed by UPS at one of its warehouses in Pennsylvania. As part of his employment, he and other Pennsylvania UPS warehouse employees are required to undergo a daily security screening process. He asserts that time spent waiting in line at the security screen, time

1

spent walking to and from the screen to workstations, and time spent using nearby lockers to put on steel-tipped boots are all compensable under the PMWA, and that UPS violated the PMWA by not paying its employees for this time.

Mr. Malone and the other employees on whose behalf he is suing are members of Union Local 384, meaning the terms of their employment are subject to a CBA in the form of a National UPS agreement and a Metro Philadelphia supplement. Together, these agreements set out, *inter alia*, what time is compensable, when work starts, overtime policies, and whether donning and doffing gear is compensable. The CBA also includes a grievance and arbitration procedure for disputes arising out of the interpretation or application of its terms.

## LEGAL STANDARD

Mr. Malone has the burden to show that this Court has subject matter jurisdiction over his claims at all stages of the litigation, *Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004), including after trial and entry of judgment, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

Mr. Malone's complaint asserts the Class Action Fairness Act ("CAFA") as the basis for federal jurisdiction. CAFA confers subject matter jurisdiction over class actions where, in relevant part, the aggregate amount in controversy exceeds $5 million. 28 U.S.C. § 1332(d)(2)-(6). It is Mr. Malone's burden to establish the amount in controversy. *Morgan v. Gay*, 471 F.3d 469, 473 (3d Cir. 2006).

UPS contends that Mr. Malone cannot satisfy this burden because his claims based on walking to and from the security screenings and donning and doffing boots are preempted by federal law and the remaining claim for time spent undergoing security screenings represents so little time that they cannot possibly amount to more than $5 million in controversy. Where the law

"denies recovery" for a cause of action, a "federal court [is] required to disregard the value of such a claim asserted to be included within the jurisdictional amount." *Samuel-Bassett*, 357 F.3d at 397–98. Because UPS's attack is factual, the Court is not limited to the pleadings and need not accept Mr. Malone's jurisdictional allegations as true. *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008).

**DISCUSSION**

## I.      Walking Time Claims

Mr. Malone's walking time claims arise under the PMWA, state law. But § 301 of the LMRA, federal law, provides that suits for violation of a CBA "may be brought in any district court of the United States." 29 U.S.C. § 185(a). Though this section refers only to federal court jurisdiction, it has also "been interpreted as authorizing federal courts to fashion a body of common law for the enforcement of collective bargaining agreements." *Antol v. Esposto*, 100 F.3d 1111, 1115 (3d Cir. 1996), *amended*, (3d Cir. Jan. 20, 1997) (citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456 (1957)). Thus, in suits over violations of a CBA, federal law governs, preempting state law.

Section 301, however, is not limited to suits that directly allege violation of a CBA; federal law preempts any time "resolution of a state-law claim is substantially dependent upon analysis of the terms" of a CBA. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). In other words, "[i]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988).

Whether a state-law claim depends upon the meaning of the terms of a CBA "is a question riddled with nuance and exception." *Oddo v. Bimbo Bakeries USA, Inc.*, No. 16-cv-4267, 2017

3

WL 2172440, at *5 (D.N.J. May 17, 2017). But the general approach is a two-step inquiry. First, the court must determine if the plaintiff's claimed right inheres purely in state law or arises under the CBA. If the answer is the CBA, the claim is preempted. If not, the court must determine whether resolving liability will require actual interpretation of the CBA, as opposed to mere consultation. *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.").

### A. The Walking Time Claims Arise Solely Under State Law

The rationale behind § 301 preemption is the need for uniform interpretation of federal labor law and labor contracts, unobstructed by variations in state-law causes of action. *See, e.g., Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962) ("[I]n enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules."). But where state law "proscribe[s] conduct, or establish[es] rights and obligations, independent of a labor contract," there is no risk of inconsistency, and thus no preemption under § 301. *Allis-Chalmers*, 471 U.S. at 212.

To determine if a state-law claim is independent of a labor contract, courts look to the elements of the cause of action and whether they may be proven without reliance on any contractual rights or provisions. If so, then the state law claim is independent, even if it overlaps with contractual rights or remedies or requires analysis of the same underlying facts. In *Lingle*, for example, the Supreme Court considered whether a state-law claim for retaliatory discharge was independent of a contractual remedy for discharge without cause. 486 U.S. at 407. The Court looked to the elements of the state court cause of action, which required only that that the plaintiff

"set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under [state law] or to interfere with his exercise of those rights." *Id.* These elements were wholly independent of any labor contract because neither "require[d] a court to interpret any term of a collective-bargaining agreement" and because an employer's liability depended on the "purely factual" question of whether it "had a nonretaliatory reason for the discharge." *Id.*

Following *Lingle*, courts have held that various state law claims are independent of labor contracts based on the elements a plaintiff must prove. *See, e.g., Klepsky v. United Parcel Service, Inc.*, 489 F.3d 264, 270–71 (6th Cir. 2007) (state law whistleblower claim was independent where liability depended only on whether an employee engaged in protected activity, whether they were subject to an adverse employment action, and whether there was a causal link between the protected activity and the adverse employment action); *Garley v. Sandia Corp.*, 236 F.3d 1200, 1212 (10th Cir. 2001) (state law civil conspiracy claim was independent where an employer's alleged conspiracy to frame an employee for misconduct, though "involv[ing] many of the same factual inquiries as assessing the plaintiff's discharge under the CBA" was nonetheless "analytically distinct from whether its actions were permitted by the CBA").

But the mere fact that the elements of a state-law cause of action do not explicitly contemplate a labor contract does not mean that the claim is necessarily independent of a labor contract under the circumstances. A court must also consider whether a plaintiff's theory of liability under a given cause of action is "inextricably intertwined" with the rights or provisions of a labor agreement. *Allis-Chalmers*, 471 U.S. at 213. Consider, for example, a state-law claim for intentional infliction of emotional distress. The elements of such a claim typically require a

plaintiff to prove (1) outrageous conduct by the defendant, (2) intent to cause, or reckless disregard of the probability of causing, emotional distress; (3) actual suffering of extreme emotional distress; and (4) a causal link between the outrageous conduct and the distress suffered. Restatement (Second) of Torts, § 46. Employers owe a duty to avoid outrageous conduct to all members of society, including their employees, independent of any labor agreement. Thus, if a court can determine whether an employer's conduct is outrageous without reference to a labor agreement, such a claim is independent. *See Hanks v. Gen. Motors Corp.*, 906 F.2d 341, 344 (8th Cir. 1990) (state-law claim for intentional infliction of emotional distress arising out of employer requiring employee to work under the direct supervision of the person who sexually assaulted her daughter was independent because "to determine the merits of [the claim], neither the trier of fact nor the trier of law has to determine whether her discharge was warranted under the terms and provisions of the collective bargaining agreement"). Sometimes, though, whether an employer's conduct is outrageous will depend in part on whether it was proper under the terms of a CBA. *Compare Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347, 1350 (9th Cir. 1985) (intentional infliction of emotional distress claim not independent where it was essentially a claim "that administration of discipline was improper under the standards set by the [CBA]") *with Tellez v. Pac. Gas and Elec. Co.*, 817 F.2d 536, 539 (9th Cir. 1987), *cert. denied,* 484 U.S. 908 (1987) (intentional infliction of emotional distress claim independent where the underlying CBA was "silent on work conditions, and vague on disciplinary formalities").

This may also be true for minimum wage claims similar to the one at issue here. In *Vadino v. A. Valey Engineers,* for example, an employee brought a claim alleging a violation of the FLSA's overtime guarantees because his employer paid him one and one-half times his "normal hourly rate," rather than one and one-half times his "journeyman" rate as defined under the applicable

CBA. 903 F.2d 253, 264 (3d Cir. 1990). The Third Circuit explained that this claim required resolution of "a dispute concerning the amount of wages that should have been paid under the terms of the [CBA]," and thus could only be resolved under § 301 of the LMRA. *Id.* at 266.

Here, Mr. Malone does not allege that UPS violated the CBA in any way; rather he asserts that UPS violated independent rights under the PMWA. The PMWA provides that "[e]very employer shall pay to each of his or her employees wages for all hours worked at a rate of not less than . . . the minimum wage set forth in the Fair Labor Standards Act of 1938." 43 Pa. Stat. § 333.104. This is a non-negotiable right that cannot be waived or circumscribed by private agreement. *See* 43 Pa. Stat. § 333.113 ("[A]ny agreement between the employer and the worker to work for less than such minimum wage shall be no defense to such action."); *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) ("The whole point of . . . the PMWA is to protect workers by overriding contractual relations through statute.").

To prevail on a PMWA claim, Mr. Malone "must demonstrate that (1) he and the other hourly workers were 'employees,' (2) [UPS] was their 'employer,' and (3) [UPS] failed to pay them the wages required by the PMWA." *Beauregard v. Broadway Electric Serv. Corp.*, No. 21-cv-1600, 2022 WL 2293969, at *7 (W.D. Pa. June 24, 2022) (citing 43 Pa. Stat. §§ 333.103, 333.104). The first two elements are independent of any contractual agreement, because "[w]hether a worker is an 'employee' subject to the protections of the PMWA is a fact-based inquiry regardless of what a contract says and even whether a contract exists at all." *Soles v. Zartman Constr., Inc.*, No. 13-cv-29, 2014 WL 3557197, at *2 (M.D. Pa. July 18, 2014). As to the third element, the term "hours worked" as used in the PMWA is defined by regulation to include

> time during which an employee is required by the employer to be on the premises of the employer, to be on duty or to be at the prescribed work place, time spent in traveling as part of the duties of the employee during normal working hours and time during which an employee is employed or permitted to work.

34 Pa. Code § 231.1(b).[1] Thus, if time spent walking to and from security screenings is "required" of UPS employees, it must be compensated under the PMWA. *See Smith v. Allegheny Techs., Inc.*, 754 F. App'x 136, 141 (3d Cir. 2018).

UPS asserts that Mr. Malone's walking time claim is inextricably intertwined with the CBA—and thus not independent—because whether walking time is "required" of employees is governed by the terms of the CBA. In support, UPS cites the Third Circuit Court of Appeals' decision in *Pa Fed'n of Bhd. of Maint. of Way Emps. v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 989 F.2d 112 (3d Cir. 1993). In that case, union employees brought a suit for unpaid overtime wages under the PMWA, alleging that AMTRAK required them to use railroad cars for transportation to and from job sites but did not pay overtime for time spent in transit. *Id.* at 113– 14. The district court held that the PMWA claim was preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 153, because it required interpretation of a CBA. *Id.* at 113. Because the Third Circuit found that RLA preemption was even broader than LMRA preemption, the court applied LMRA precedent and concluded that "in order to determine whether the workers are '*required by the employer* to be on the premises of the employer, to be on duty, or to be at the prescribed work place' during the time spent traveling," thus bringing that time within the PMWA, the court "would have to interpret the collective bargaining agreement." *Id.* at 115 & n.7. According to UPS, *AMTRAK* stands for the broad proposition that whenever an employee's duties are set forth in a CBA, whether a given activity is compensable under the PMWA is governed by that CBA such that any PMWA claim is preempted by § 301 of the LMRA.

UPS's reliance on *AMTRAK* is misplaced, for several reasons. First, the Third Circuit did not base its decision in *AMTRAK* purely on the fact that there was an applicable CBA that set forth

---

[1]     The PMWA does not itself define "hours worked," but instead authorizes the Pennsylvania Department of Labor and Industry to define this term via implementing regulations. 43 Pa. Stat. § 333.109.

the duties of railroad employees. Rather, the Court examined the specific claims at issue to

ascertain whether it was possible to resolve the PMWA claim without resorting to the CBA. As

the Court explained, whether employees were "*required* to travel on the AMTRAK vehicles after

their work shifts are done" in fact required examination of the CBA:

> For example, a worker living near a job site might be able to go directly home
> instead of going on an AMTRAK vehicle back to headquarters. Similarly, if a job
> site were near the place of employment of a worker's spouse, the spouse might be
> able to pick up the worker on the way home. The only way to determine whether
> such arrangements would be permissible is to look to the collective bargaining
> agreement.

*AMTRAK*, 989 F.2d at 115. In other words, *AMTRAK* stands for the proposition that whether

something is "required" of employees *may*, under certain circumstances, require a court to look to

a CBA, not that this is always the case.

Second, as the *AMTRAK* concurrence explained, the majority did not "expressly distinguish

between interpreting or construing a collective bargaining agreement, on the one hand, and merely

referring to it on the other." *Id.* at 116 (Lewis, J., concurring). Indeed, the *AMTRAK* opinion uses

the term "interpret" interchangeably with the terms "look to" and "ascertain." *Id.* at 115–16. But

as subsequent Supreme Court precedent makes clear, there is a world of difference between

interpretation and mere consultation, and the distinction can be dispositive for purposes of § 301

preemption. *See Livadas*, 512 U.S. at 124. ("[T]he bare fact that a collective-bargaining agreement

will be consulted in the course of state-law litigation plainly does not require the claim to be

extinguished."). Because the Third Circuit neither considered this distinction nor explained which

specific terms of the CBA required interpretation, *AMTRAK* cannot support the broad proposition

for which UPS cites it.

Third, subsequent Third Circuit precedent makes clear that a claim for overtime wages may

indeed be wholly independent of a CBA for purposes of § 301 preemption, even where the CBA

addresses whether certain work is compensable. In *Bell v. Southeastern Pennsylvania Transportation Authority*, employees brought a FLSA claim for unpaid wages and overtime for work performed during morning "pre-trip" inspections. 733 F.3d 490, 491 (3d Cir. 2013). The district court dismissed the FLSA claim because it found that whether or not time spent on "pre-trip" inspections was considered work depended on the terms of the CBA that addressed "[c]ompensation for work conducted prior to the official work start time." *Bell v. Se. Pa. Transp. Auth.*, No. 11-cv-4047, 2012 WL 4479272, at *6 (E.D. Pa. Sept. 28, 2012). But the Third Circuit vacated that decision, explaining that whether "pre-trip" time was compensable under the FLSA did not depend on the CBA at all:

> Rather, resolution of the FLSA claim requires a factual determination of the amount of time Operators are required to work prior to their scheduled start, and a legal determination regarding whether this time is (1) compensable and (2) subject to the overtime provisions of the FLSA. 29 U.S.C. § 207(a)(1). . . . [N]either of these determinations depends on the resolution of a disputed reading of the CBAs.

*Bell*, 733 F.3d at 495.

Fourth, UPS's reading of *AMTRAK* is inconsistent with how Congress intended for the LMRA to interact with state wage and hour laws. As the Supreme Court has explained, § 301 was enacted to ensure that the terms of CBAs would be uniformly interpreted according to federal common law. *See Lingle*, 486 U.S. at 404. It was not intended to displace "nonnegotiable rights conferred on individual employees as a matter of state law." *Livadas*, 512 U.S. at 123. To the contrary, "Congress is understood to have legislated against a backdrop of generally applicable labor standards." *Id.* at 123 n.17. On UPS's reading of *AMTRAK*, however, unions and employers could evade state wage laws like the PMWA entirely by simply defining what activities and time are compensable in a CBA, contrary to Congress's intent. *See Allis-Chalmers Corp.*, 471 U.S. at 212 ("[Section] 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law.").

The Court thus concludes that Mr. Malone's walking time claims under the PMWA are not inextricably intertwined with the CBA. Rather, as in *Bell*, these claims depend only on whether walking time is compensable under the PMWA, independent of any contractual rights under the CBA. This does not end the inquiry, however; the Court must still determine whether resolving Mr. Malone's PMWA claims will nonetheless require interpretation of the CBA.

## B. The Walking Time Claims will not Require Interpretation of the CBA.

The line between interpretation and mere consultation can be difficult to ascertain. At one extreme, interpretation is clearly necessary where a plaintiff's theory of liability depends on one or more terms in a CBA whose meaning is disputed. Indeed, several courts have held that a specific dispute over the meaning of CBA terms or provisions is a prerequisite for preemption under § 301. *See, e.g., Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 760 (7th Cir. 2008) (explaining that preemption "will only occur if the parties dispute the CBAs' terms"); *Basa v. Rizza Chevrolet, Inc.*, 750 F. Supp. 2d 987, 989 (N.D. Ill. 2010) ("[W]ithout an identification of a dispute between the parties concerning terms or provisions in the CBA, it [is] premature for the district court to find preemption."). At the other extreme are cases in which the terms of a CBA need only be consulted, such as to calculate damages, which does not warrant preemption. *See Livadas*, 512 U.S. at 124 ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."); *Bull v. United Parcel Serv., Inc.*, No. 07-cv-2291, 2014 WL 2965696, at *14 (D.N.J. July 1, 2014) ("The CBA may have been relevant to the determination of certain issues of fact, but there is no dispute about what it says, what it means, whether it is valid, or whether [the plaintiff] is bound by it.").

Mr. Malone asserts that this case falls into the latter category, and that no interpretation is necessary to determine UPS's liability. As discussed above, the PMWA and its implementing regulations require that employees be compensated for any time during which they are required to be on UPS's premises. UPS asserts, however, that whether its employees are "required" to walk to and from security screenings as part of their employment depends, in part, on the terms of the CBA.

UPS first points to Article 53 of the Philadelphia Supplement, which provides that "[a]ll employees covered by this Agreement shall be paid for all the time spent in the service of the Employer, and that "[t]ime shall be computed from the time that the employee is ordered to report for work and registers in and until the time he/she is effectively released from duty." Doc. No. 31-5, Ex. C., Art. 53, § 1(a). It contends that a court would need to interpret the term "time spent in the service of the Employer" to ascertain if walking time is "required" and thus compensable.

This argument is unavailing for two reasons. First, UPS does not point to any actual dispute over the meaning of this term. *Cf. Oddo*, 2017 WL 2172440, at *8 ("Nor do the defendants alert me to any live interpretational dispute as to specific terms in the CBA that I would need to resolve in order to adjudicate the [minimum wage] claim."). Second, even if there were a real dispute over the meaning of this provision, interpretation would only reveal whether walking time is compensable *under the CBA*. Mr. Malone's claim, however, is that even if this time is not compensable under the CBA, it is nonetheless compensable under the PMWA. As discussed above, the PMWA creates rights that are independent of any CBA, meaning that an employer who fully complies with the terms of a CBA may nonetheless run afoul of the PMWA. *See, e.g., Larue v. Great Arrow Builders LLC*, No. 19-cv-932, 2020 WL 5747818, at *10–*12 (W.D. Pa. Sept. 25, 2020) (finding no LMRA preemption where the plaintiff's claim was that travel and donning and

doffing time that was excluded from the scope of compensation under the applicable CBA was nonetheless compensable under the PMWA); *Glatts v. Crozer-Keystone Health Sys.*, 645 F. Supp. 2d 446, 450 (E.D. Pa. 2009) ("Plaintiff does not allege that Defendants' violated the [PMWA] by failing to pay him overtime wages for the performance of certain duties. Rather, Plaintiff challenges the legality of Defendants' formula for calculating overtime pay . . . under Pennsylvania state law. Thus, the resolution of Plaintiff's claim requires an analysis of Pennsylvania state law, not the CBA."). In other words, whether any given activity constitutes "compensable work under the PMWA must be determined by applying the facts of the case to the PMWA's 'hours worked' regulation," an assessment that is independent of the CBA's definition of compensable time. *Ballard v. BHI Energy, Inc.*, No. 22-cv-115, 2022 WL 4464959, at *5 (W.D. Pa. Sept. 26, 2022).

Next, UPS points to Article 54, § 1(c), which provides that an employee "who reports to work or who starts to work on any day, shall be paid for a full day's work of eight (8) hours," regardless of how much time was actually spent working. Doc. No. 31-5, Ex. C. Art. 54, § 1(c). UPS asserts that resolution of Mr. Malone's PMWA claim will require interpretation of this provision to determine whether this compensation may offset any unpaid time under the PMWA. This argument fails for three reasons. First, the meaning of § 1(c) is not in dispute. Second, whether or not this time may offset any unpaid time under the PMWA is purely a matter of state law. *See* 34 Pa. Code § 231.43(e). Third, whether any particular employee was actually paid for time not spent working under § 1(c) is a factual question that can be ascertained from payroll information. Thus, there is no need to interpret the CBA to determine whether an employee was entitled to guaranteed minimum hours, whether they were paid for time not spent working, or whether such pay can offset unpaid walking time under the PMWA.

UPS also points to Article 54, §1(g), which provides that an employee is only entitled to the guaranteed minimum payment under §1(c) if they "commence work at his/her scheduled starting time and complete his/her scheduled shift." Doc. No. 31-5, Ex. C. Art. 54, § 1(g). UPS asserts that this provision must be interpreted to determine whether an employee's "scheduled starting time" and "scheduled shift" includes walking time. Again, interpretation of § 1(g) would only reveal whether walking time entitles an employee to contractual guarantees, not whether walking time is compensable under the PMWA. Thus, even if the meaning of this provision were in dispute, it would not bear on UPS's liability under the PMWA.

Finally, UPS points to various sections of the CBA that entitle employees to overtime pay. But whether any of these provisions apply to walking time has no bearing on whether walking time is compensable under the PMWA, and whether any overtime pay can offset unpaid walking time is purely a matter of state law.

UPS cites a recent opinion from the Central District of California in support of its argument that these provisions must be interpreted in order to resolve Mr. Malone's walking time claims. In *Mellon v. Universal City Studios, LLC*, the district court considered whether a state minimum wage law was preempted by § 301. No. 22-cv-3950, 2022 WL 4021692, at *2–*5 (C.D. Cal. Sept. 2, 2022). California state law, like the PMWA, created an independent, non-negotiable right for employees to be paid for "all hours worked," defined as "the time during which an employee is subject to the control of an employer, [including] all the time the employee is suffered or permitted to work, whether or not required to do so." *Id.* at *3 (quoting Cal. Code Regs. tit 8, §§ 11100(4)(A), (2)(H)). The applicable CBA provided that, in addition to hourly pay, employees were to be paid for "walking/changing time" that was intended to "compensate employees for any time the employee may be subject to the control of the Employer but not actually performing his or her

Case 2:21-cv-03643-GEKP   Document 43   Filed 05/09/23   Page 15 of 17

duties." *Id.* at *4. The plaintiffs received this "walking/changing time" pay but were not separately paid for time spent undergoing security screenings. *Id.* at *1. The defendant maintained, however, that time spent in security screenings was included in "walking changing time" and that all employees had therefore been appropriately compensated under California law. *Id.* at *4. In other words, whether employees had been paid for this time—and thus whether the employer was liable under state law—depended on a disputed interpretation of the CBA's term.

Not so, here. Mr. Malone's claim is that UPS only paid employees based on when employees clocked in and out, and that walking time was uncompensated because it occurred before and after employees clocked in and out. UPS points to no analogous CBA provision that, as in *Mellon*, could be interpreted in a way that would lead to the conclusion that Mr. Malone and other employees were in fact compensated for walking time. Thus, whether employees were paid for walking time is a purely factual question that can be determined without any interpretation of the CBA.

For the foregoing reasons, Mr. Malone's PMWA claim is not inextricably intertwined with any rights under the CBA, nor will it be necessary to interpret any provision of the CBA to resolve his PMWA claim. Accordingly, § 301 of the LMRA does not preempt the PMWA claims, and the value of those claims counts towards satisfying CAFA's $5 million amount-in-controversy requirement.

## II.    Donning and Doffing Time Claims

UPS also asserts that Mr. Malone's donning and doffing claims must be dismissed because they are both factually deficient and preempted by § 301 of the LMRA. For purposes of deciding subject-matter jurisdiction, however, the Court considers only preemption.

As above, UPS asserts that whether donning and doffing time constitutes "hours worked" under the PMWA requires interpretation of the CBA, again citing *AMTRAK*. As discussed above, however, its reliance on *AMTRAK* is misplaced. Mr. Malone's rights under the PMWA are independent of the CBA's terms, and UPS's liability under the PMWA depends solely on "a factual determination of the amount of time [employees] are required to work prior to their scheduled start, and a legal determination regarding whether this time is (1) compensable and (2) subject to the overtime provisions of the [PMWA]." *Bell*, 733 F.3d at 495.

UPS also asserts that interpretation of the CBA is necessary to resolve Mr. Malone's donning and doffing claims, noting that the CBA explicitly provides that "[e]mployees shall change into uniforms on the Company premises before reporting for duty and change out of uniforms after being relieved from duty each day." Doc. No. 31-5, Ex. C, Art. 65. But UPS does not explain how the meaning of this clear provision is in dispute. Moreover, it does not matter whether donning and doffing time is compensable under the CBA because it is explicitly compensable under the PMWA. *See Larue*, 2020 WL 5747818, at *12 ("Pennsylvania law protects employees by not permitting unions and employers to negotiate away payment for donning and doffing of clothes . . ."). Thus, no interpretation of the CBA is necessary to resolve the donning and doffing claims, these claims are not preempted by § 301 of the LMRA, and their value counts towards CAFA's amount-in-controversy requirement.

CONCLUSION

For the foregoing reasons, neither Mr. Malone's walking time nor donning and doffing claims are preempted by §301 of the LMRA. The value of these claims thus counts towards CAFA's amount-in-controversy requirement, bringing the aggregate damages above $5 million.[2] Therefore, the Court denies UPS's motion to dismiss. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[2] To assert CAFA jurisdiction, the party alleging jurisdiction must justify its allegations by a preponderance of the evidence. *See Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 506–07 (3d Cir. 2014). The Court is satisfied, based on the declaration of Sarah Schalman-Bergen, that Mr. Malone's walking and donning and doffing claims reflect a dispute over at least 17.63 minutes per day of uncompensated time per employee, resulting in an amount in controversy of well over $5 million. As UPS's only challenge to the amount-in-controversy is based on preemption, the Court finds that Mr. Malone has satisfied his burden to demonstrate CAFA jurisdiction.