## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL MALONE, et al., on behalf of themselves and others similarly situated**,<br><br>*Plaintiffs*,<br><br>v.<br><br>**UNITED PARCEL SERVICE, INC.**,<br><br>*Defendant*. | **Case No. 2:21-cv-03643-JDW** |

### <u>MEMORANDUM</u>

Important journeys often begin at a humble threshold. Bilbo Baggins's round door, Alice's rabbit hole, or the portal to Narnia at the back of a wardrobe. In this case, the threshold is a guard shack at the entrance to a UPS facility that UPS requires its employees to pass through on the way into and out of work. For years, UPS didn't pay employees for the time going through that screening, and it still doesn't pay them for the time they spend walking between a security checkpoint and a time clock at the beginning and end of each shift. If UPS accounted for that time, many of its employees would be entitled to overtime pay that UPS hasn't paid.

At the moment, the dispute in question is whether I should certify a class of UPS workers to challenge UPS's practices collectively. As I explain below, I conclude that Plaintiffs have come forward with sufficient evidence to show that class treatment is

appropriate. Although UPS argues that the Motor Carrier Act and its own record-keeping are problems that should prevent class certification, the problems that UPS identifies—many of which are of its own making—do not prevent Plaintiffs from ascertaining which employees are part of the class. Nor do those issues overcome the central question of whether the Pennsylvania Minimum Wage Act requires UPS to pay its employees for the time they spend walking through security and its warehouses. Thus, I will grant Plaintiffs' Motion For Class Certification, though I will modify the class definition some to account for issues that have arisen.

## I.    BACKGROUND

### A.    Factual History

#### 1.    UPS facilities in general

UPS's facilities are comprised of certain operations, referred to as Hub, Package, and Feeder. Some facilities may not have all three operations.[1] Hub operations load and unload packages from tractor trailers (aka "feeders") that move between UPS facilities and move those packages within UPS's facilities to their next destination. Package operations pick up packages from customers to be moved into Hub operations and deliver packages to customers after those packages have moved through the Hub. In general, the Package operation is the first or last leg of a package's journey with UPS. This operation involves:

---

[1]    Other operations at UPS facilities include BaSE engineering, automotive, Industrial Engineering, information technology, and administrative support.

(1) loading and unloading of package cars—*i.e.*, the ubiquitous brown UPS delivery vehicles; (2) moving packages to and from Hub operations; and (3) delivering packages.

In Hub and Package, many positions' primary job duties involve loading tractor trailers or package cars. Other positions also engage in loading functions on an as-needed basis. Hub also employs various "sorters" who sort packages on belts to different areas within the Facilities, and "pickoffs" who direct sorted packages to specific trucks. Likewise, Package sorters sort packages off belts and direct them to trucks for loading.

As part of its business, UPS gathers data to track packages. In its Hub operations, UPS uses its Global Scanning System ("GSS") to scan packages. The method of scanning varies depending on whether the facility is automated or conventional. At automated facilities, packages travel through tunnels, and cameras scan the labels as the packages go by. At the end of the line, an employee loads the packages onto a truck. At conventional facilities, however, Hub employees use a scanner to scan each package before loading them into trucks. The scanners are associated with the employees using them, so it is possible to identify which UPS employee loaded a particular package. However, there are instances where employees share scanners or engage in team loading where one person scans and others load. UPS uses separate tools, such as the Harmonized Enterprise Analytics Tool ("HEAT") and the Service Exception Analysis System ("SEAS"), to aggregate and synthesize GSS data. This data tracks and analyzes package-level data and employee scan volume. On the Package side of operations, employees generally do not

3

use GSS scanners when loading package cars. Rather, a sorter or pickoff employee uses GSS scans before directing a package to be loaded.

Feeder operations oversee the tractor trailers that move packages between UPS facilities. This includes drivers and their dispatch. UPS employs drivers and driver's helpers to drive the feeders and package cars. UPS also employs seasonal support drivers, or personal vehicle drivers ("PVDs"), who use their personal cars to deliver packages. Automotive operations pertain to the service and maintenance of UPS vehicles. Those workers repair UPS's package cars, tractor trailers, and other vehicles. Finally, Air operations oversee delivery, pickup, loading, and unloading of packages sent through UPS's premium delivery options.

Most of UPS's hourly employees in its Hub, Package, and Feeder operations are unionized employees who are subject to a collective bargaining agreement ("CBA"). Under the CBA, these employees work as directed, which means that UPS can modify their roles or responsibilities on an as-needed basis. UPS does this as business needs require, which can be daily. Similarly, non-union employees working within the Hub, Package, and Feeder operations, such as Part-Time Supervisors, also tend to work as directed. Because these employees are "work as directed," their internal work profiles may not capture the full scope of their duties. Likewise, employees' job descriptions are not exhaustive, and they may engage in additional activity that the official job description does not capture.

### 2.    Plissken Facilities and security screenings

UPS operates more than seventy facilities across Pennsylvania. In the second half of 2021, UPS started to implement what it refers to as "Project Plissken" in Pennsylvania. The goal behind Project Plissken was to start tracking, and paying, UPS employees for time they spent walking through and undergoing security checks before and after entering certain facilities. UPS determined that ten facilities in Pennsylvania fell within the scope of the project, meaning that those facilities had security guards that screened employees upon entry to or exit from the building. Those facilities, the "Plissken Facilities," include UPS facilities in: (1) Carlisle, (2) Bethlehem, (3) Harrisburg, (4) New Stanton, (5) North Shore, (6) Oregon Avenue (Philadelphia), (7) West Chester, (8) Willow Grove, (9) Philadelphia Air Hub, and (10) Middletown.

Each of the Plissken Facilities has at least one guard shack that employees pass through to enter and exit the building. Project Plissken requires UPS employees to "badge in" when they enter the guard shack, walk through, and then "badge out" when they exit the guard shack. The badging system integrates with UPS's payroll system to pay employees for the time between the two badge swipes. This is known as "Security Checkpoint Activity Recording" or "SCAR" time. UPS started paying employees for this time as of December 5, 2021. If an employee fails to badge in or out, then UPS pays the employee the average amount of time it takes to go through security.

The security screenings that take place within the guard shacks can vary depending on the facility. Each facility's local security team determines if screenings are needed and sets the process. Screenings can involve employees walking through a metal detector, passing through a turnstile, or showing their employee badges, or guards might wand employees or search their bags, if any. There are some occasions where security guards may be distracted or absent from work. Thus, they do not screen employees in those instances, though the employees must still walk through the guard shacks. Facilities may have entrance screenings, exit screenings, or both. Employees who work inside the Plissken Facilities must go through the guard shack before they can enter the building.

After employees exit the guard shacks, they enter the building through a designated employee entrance. Some facilities have more than one employee entrance. Once inside the building, employees walk to their designated work area. The Plissken Facilities are large warehouses. For example, the Middletown facility is one of UPS's largest facilities in the United States, at nearly 800,000 square feet. Thus, warehouse employees must walk a distance between the employee entrance and their work area. UPS does not pay them for the time they spend walking between these two points. Once employees reach their reporting areas, they clock-in. At that point, UPS starts paying them for their time. At the end of their shift, employees clock-out, though they may do so at a different location than where they started their day. UPS does not pay employees after they clock-out. Thus, UPS does not pay employees for the time they spend walking from their final

work area to the exit. Though employees are not permitted to use their personal phones during their shifts, they may use them while walking to and from their reporting areas before and after their shifts, and some employees do.

UPS utilizes a variety of timekeeping systems to track employees' time, including its Global Timecard System ("GTS"), Hub Timecard Module ("HTM"), UPS Activity System ("UPSAS"), Personal Time Recording System ("PTRS"), Automotive Information System ("AIS"), Generic Timecard Weekly Operations Report ("GTWOR"), and Staffing And Time Card Management System ("STMS"). Different operations use different timekeeping systems.

GTS is a timekeeping system that covers employees in UPS's Feeder and Package operations. GTS uses many different codes (like job and work codes) to track employees. GTS also utilizes "Package Job Codes" (also referred to as "Job Classification Codes") that associate employees with certain timecards, depending on the employees' designations and how the employees clock in.

On the Hub-side, UPS uses HTM, which is a timecard management system for hourly employees. HTM contains certain numerical job type codes that either default to a certain code or may be edited by an employee when completing their timecard. HTM also contains fields that identify the shift (called the "sort") on which a Hub employee works, as well as the specific work area to which area the employee is assigned. Different work areas include unload, primary sort, pickoff, load, air sort, secondary sort, incompatibles,

and smalls sort. (*See* ECF No. 113-27 at UPS-1281.) Employees may swipe their timecard badge when changing work areas during their shift, but this does not always happen.

PTRS is the timekeeping application that covers Full-Time Specialists, Part-Time Specialists, and Part-Time Supervisors. PTRS does not maintain a code identifying an employee's work area, but it does associate employees with a specific Supervisor Group. Automotive employees enter their timecards via the AIS system, and UPS uses GTWOR to capture timecard data for certain global air hub employees.

### 3.    Plaintiffs

Michael Malone has worked at UPS's Willow Grove facility since 1992. He is a Hub employee. As such, he must: (1) walk through the guard shack before his shift; (2) report to a designated work area each day where he clocks-in; and (3) walk through the guard shack after his shifts ends. Like most of UPS's hourly employees, Mr. Malone is a member of the union, and UPS employs him subject to the CBA. Mr. Malone is also an Article 22.3 employee. Article 22.3 employees work a full-time schedule comprised of two part-time jobs. Mr. Malone primarily does pickoff and quality control. However, Mr. Malone spends a small portion of his day loading packages onto trucks, usually at the end of his shift.

Randy Shepler started working for UPS in 1987. He is also a Hub employee and works at UPS's New Stanton facility. Like Mr. Malone, Mr. Shepler must report to a designated work area at the beginning of his shift. On his way into work, Mr. Shepler goes through a turnstile in the guard shack, and he undergoes a "clean out" screening after his

8

shift ends. He is also a union member. While he primarily works as a sorter on irregular packages, he works as directed. Likewise, his work location may vary throughout the day.

Keri Green is a part-time Hub employee who worked at UPS's Harrisburg facility before transferring to the Middletown facility in September 2022. UPS hired her as an unloader, but because she did not like the position, UPS agreed to change it. Now, she works as a revenue recovery clerk and in the small sort. She does not load or unload trucks in either role. Ms. Green is a union member.

### B.    Procedural History

On August 16, 2021, Mr. Malone filed this lawsuit on behalf of himself and similarly situated UPS employees. He asserts that UPS violates the Pennsylvania Minimum Wage Act ("PMWA") by failing to pay overtime wages associated with the time employees spend going through mandatory security screenings and walking to and from their reporting areas before and after their shifts.

Mr. Malone first moved to certify a class on January 19, 2024. In its response, UPS made clear for the first time that intended to assert an affirmative defense based on an overtime exemption under the PMWA that mirrors a Fair Labor Standards Act exemption for employees who the Motor Carrier Act of 1935 ("MCA") exempts. In May of 2024, the Chief Judge reassigned this case to me, and I held a hearing on the impact of the MCA defense on class certification that September. Following the hearing, I reopened discovery

for the limited purpose of permitting Mr. Malone to explore and test the MCA defense. This renewed discovery period closed on May 30, 2025.

Prior to the close of discovery, Mr. Malone filed a First Amended Complaint that included Mr. Shepler, Ms. Green, Devin Whitman, and Logan Green as plaintiffs. Their claims under the PMWA remain the same. Since then, however, Mr. Whitman and Mr. Green agreed to arbitrate their individual claims against UPS.

On June 20, 2025, Mr. Malone, Mr. Shepler, and Ms. Green ("Plaintiffs") filed their Motion For Class Certification, seeking certification of the following class (the "Proposed Class"):

> All hourly-paid Warehouse Workers who were employed by UPS at a Plissken PA Facility at any time since August 16, 2018, through the date of class certification and who worked 40 or more hours in one or more workweek, excluding those individuals for whom UPS has a record of their having acknowledged UPS's arbitration agreement.

(ECF No. 105 at 1.) Plaintiffs define "Warehouse Workers" as "hourly-paid employees excluding work performed as a driver, driver's helper, or automobile mechanic." (*Id.*)

UPS opposes certification, and I held a hearing on Plaintiffs' motion on October 21, 2025. The motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) requires a plaintiff to establish: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of

10

the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). If a claim satisfies those four requirements, then a plaintiff must then satisfy one subsection of Rule 23(b). Pursuant to Rule 23(b)(3), certification is appropriate where (5) common questions of law or fact predominate (predominance), and (6) the class action is the superior method for adjudication (superiority). *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). Any class must also be "currently and readily ascertainable based on objective criteria." *Id.* at 593.

When conducting this analysis, a court must be careful not to certify a class "casually." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 132 (E.D. Pa. 2015). Instead, class "certification is proper only if the trial court is satisfied, after a rigorous analysis" that the moving party has fulfilled the necessary requirements. *Ferreras v. American Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). This inquiry will at times require a court to examine issues that overlap, to some extent, with the final merits determination. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). However, the court should only engage in this overlapping analysis to the extent necessary to resolve the class certification motion, and no more. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

The party seeking class action status "bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Marcus*, 687 F.3d at 591. That party must have the evidence to do so at the time it seeks class certification. *See Hydrogen Peroxide*, 552 F.3d at 318.

## III.    ANALYSIS

### A.    Statutory Framework

The PMWA requires every employer to pay its employees "wages for all hours worked...." 43 P.S. § 333.104(a). In addition, employees are entitled to compensation at a rate of one and one-half times the regular rate for all hours worked in excess of 40 hours per week. *See* 43 P.S. § 333.104(c). "Hours worked" includes: (1) "time during which an employee is required by the employer to be on the premises of the employer," (2) time during which the employer requires the employee "to be on duty or to be at the prescribed work place," (3) "time spent in traveling as part of the duties of the employee during normal working hours[,] and [(4)] time during which an employee is employed or permitted to work[.]" 34 Pa. Code § 231.1(b). "[T]ime spent on the premises of the employer for the convenience of the employee shall be excluded" from "hours worked." *Id.* "[T]o recover overtime compensation under the [PMWA][2], 'an employee must prove that he worked overtime hours without compensation, and he must show the amount and

---

[2]    "Because of the similarities between the PMWA and the FLSA, Pennsylvania courts analyze overtime and minimum wage violations of the PMWA and the FLSA under the same framework." *Bansept v. G & M Auto.*, 434 F. Supp. 3d 253, 258 (E.D. Pa. 2020).

extent of his overtime work as a matter of just and reasonable inference.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quotation omitted).

Employees "of a motor carrier with respect to whom the Federal Secretary of Transportation has power to establish qualifications and maximum hours of service" are exempt from the PMWA's overtime requirements. 43 P.S. § 333.105(b)(7). In turn, the MCA "vests in the DOT power to establish reasonable requirements with respect to qualifications and maximum hours of service of employees and safety of operation and equipment of common and contract carriers by motor vehicle." *Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 871 (3d Cir. 2015) (quotation omitted) (cleaned up). "Two considerations dictate whether the MCA exemption applies: the class of the employer and the class of work the employees perform." *Id.* at 872.

In this case, there is no apparent dispute that UPS is a motor carrier subject to the DOT's jurisdiction. However, the Parties dispute whether (and to what extent) UPS's employees engage "'in activities of a character directly affecting the safety of operation of motor vehicles in the transportation ... of passengers or property' in interstate commerce." *Id.* (quoting 29 C.F.R. § 782.2(a)). Ultimately, UPS "bear[s] the burden to prove 'plainly and unmistakably' that its employees are exempt[,]" and I must construe the MCA exemption "narrowly" against it. *Id.* (quotation omitted).

Employees are exempt under the MCA if:

[Their] work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper,

loader, or mechanic, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the [MCA].

29 C.F.R. § 782.2(b)(2) (citations omitted). "In determining whether an employee falls within such an exempt category, neither the name given to his position nor that given to the work that he does is controlling; what is controlling is the character of the activities involved in the performance of his job." *Id.* (same). It does not matter if the exempt activity is not the employee's primary duty. Instead, the exemption will apply if the job duties are such that the employee "is (or ... is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of [a driver, driver's helper, loader, or mechanic.]" 29 C.F.R. § 782.2(b)(3).

A "loader" "is an employee ... whose duties include, among other things, the proper loading of his employer's motor vehicles so that they may be safely operated on the highways of the country." 29 C.F.R. § 782.5(a). Just placing an item on a truck does not automatically make someone a loader for purposes of the MCA. *See* 29 C.F.R. § 782.5(c). Instead, an employee qualifies as a loader "so long as he has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized." 29 C.F.R. § 782.5(a). "[A]ctivities relating to the preservation of the freight as distinguished from the safety of operation of the motor

vehicles carrying such freight" are not exempt. 29 C.F.R. § 782.5(c). Whether the exemption applies can vary week-by-week and turns on whether the employee's work was more than *de minimis* in a given week. *See* 29 C.F.R. § 782.2(b)(3).

Given the statutory regime, determining whether an employee is exempt as a loader depends on a variety of facts, including the type of work in which the employee engaged, how often the employee performed the work, whether the employee could reasonably be expected to engage in loading, whether the employee exercised any discretion in performing those duties, why the employee loaded items the way he did, and whether (and to what extent) the employee performed these duties in different workweeks. In short, determining whether someone is a loader under the MCA is fact intensive.[3] However, the ultimate issue of "[w]hether employees' 'particular activities excluded them from the overtime benefits of the [PMWA] is a question of law.'" *Resch*, 785 F.3d at 872 n.6.

## B.    Ascertainability/Class Definition

To establish that a proposed class is ascertainable, a plaintiff must show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citation

---

[3]    The same is true of determining whether an employee is exempt as a driver, driver's helper, or mechanic. *See, e.g.*, 29 C.F.R. § 782.3 (defining drivers); 29 C.F.R. § 782.4 (defining driver's helper); 29 C.F.R. § 782.6 (defining mechanics).

omitted). When class members "are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. Ascertainability does not require that "a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'" *Byrd*, 784 F.3d at 163 (quotation omitted) (original emphasis). This process can include matching records across multiple computer databases or even cross-referencing a defendant's voluminous records with affidavits from putative class members. *See Kelly v. RealPage, Inc.*, 47 F.4th 202, 223 (3d Cir. 2022) (citing *Byrd*, 784 F.3d at 169-71; *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020); and *City Select Auto Sales, Inc. v. BMW of N. Am. Inc.*, 867 F.3d 434, 442 (3d Cir. 2017)).

The Proposed Class consists of "Warehouse Workers," who Plaintiffs define as "hourly-paid employees." (ECF No. 105 at 1.) At the hearing on the Motion For Class Certification, Plaintiffs made clear that drivers, driver's helpers, and mechanics are *not* meant to be part of the Proposed Class,[4] but their definition of Warehouse Workers causes confusion. While their definition excludes "*work* performed as a driver, driver's

---

[4]     Plaintiffs' Counsel represented that the exclusion of drivers, driver's helpers, or automobile mechanics "is not based on the [MCA]. That's because this case has never been about drivers. It was never our understanding it was about drivers. It's not how the Complaint reads. This case is about the warehouse workers who are walking through security and walking to their designated work areas. So we had never intended the case to involve drivers, and we wanted to make clear that it does not involve drivers now." (Tr. Of Hearing On Plaintiff's Motion For Class Certification dated Oct. 21, 2015 ("Tr.") at 13:14-22.)

helper, or automobile mechanic[,]" it does not exclude those **employees** from the Proposed Class. (*Id.* (emphasis added).) Plaintiffs contend they are not seeking damages for any time Warehouse Workers spent engaged in those activities, but that is distinct from the question of which employees fall within the Proposed Class in the first instance. As for which employees should be in the Proposed Class, Plaintiffs clarified at the hearing that they conceive of Warehouse Workers as "inside employees within UPS's system. ... [T]hat's who the group is. They are inside employees." (Tr. 29:12-17.) On the other hand, Plaintiffs view drivers, driver's helpers, and mechanics as non-inside employees and made clear that they do not intend to include them as part of the Proposed Class. (*See id.* at 30:2-14.) Thus, to eliminate the confusion arising from Plaintiffs' definition,[5] I will revise the definition of "Warehouse Workers" to refer only to employees who work inside a UPS warehouse.

UPS has timekeeping records that would permit Plaintiffs to determine who is in the class based on objective criteria. For employees within UPS's Feeder and Package operations, Plaintiffs can use timecard data from GTS to determine which employees worked inside UPS's warehouses. The four types of available timecards in GTS include: (1)

---

[5]    Plaintiffs' definition also caused confusion because it relied on terms that mirror those set forth in the MCA exemption, but Plaintiffs claim that the exclusion in their definition "is not based on the [MCA]." (Tr. 13:14-15.) Disclaiming the definitions from the MCA avoids any fact-intensive inquiries or mini-trials as to who qualifies as a driver, driver's helper, or mechanic for purposes of determining who is (or isn't) in the Proposed Class.

Driver, (2) Helper, (3) Insider, and (4) Absent. Thus, Plaintiffs can rely on "Insider" timecards to determine which employees within the Feeder and Package operations worked inside UPS's warehouses.[6] Hub employees are insiders as well. Indeed, UPS concedes that "[t]he Hub generally relates to *in-warehouse* operations ...." (ECF No. 108 at 3-4 (emphasis added).) And UPS tracks Hub employees using the HTM and STMS timecard systems. Thus, Plaintiffs can rely on the GTS, HTM, and STMS systems to identify Warehouse Workers—*i.e.*, inside employees.

Likewise, Plaintiffs can rely on the PTRS timekeeping system to identify Full-Time Specialists, Part-Time Specialists, and Part-Time Supervisors who work inside UPS's warehouses. PTRS maintains a code that identifies the "OpType" to which the employee is assigned (e.g. Hub, Package, Feeder). An employee assigned to Hub is inside, and the Parties agree that employees assigned to Feeder are not part of the Proposed Class.[7] As for Part-Time Supervisors who are assigned to Package, I can make a fair and reasonable inference that UPS knows which employees these part-time supervisors oversee. Thus, Plaintiffs can determine which Part-Time Supervisors in Package work inside the warehouse based on the status of the employees they supervise. Though this may be a tedious exercise for this subset of PTRS employees, it can be done. However, I will exclude

---

[6]    GTS also designates certain employees as "ON ROAD," and there is no dispute that employees designated as such should not be included as part of the Proposed Class.

[7]    During the hearing on the motion, Plaintiffs' Counsel acknowledged that "feeder is a driver position." (Tr. 22:10-11.) And UPS does not dispute that workers designated as "Feeders" should not be included in the class. (*See id.* at 23:16-17.)

Full-Time and Part-Time Specialists from the class because it is not clear to me that there is an objective way to determine which specialists work inside UPS's warehouses. Thus, "Warehouse Workers" refers to: employees who work inside a UPS warehouse and are not Full-Time or Part-Time Specialists. Finally, there does not appear to be any dispute between the Parties that employees subject to the GTWOR and AIS timekeeping systems are not inside employees who are part of the Proposed Class.[8]

While UPS complains that the class definition captures employees who may be subject to the MCA defense—because they are loaders, drivers, driver's helpers, or mechanics—that presence of a defense for certain class members does not affect ascertainability. If anything, UPS's concerns about the MCA defense bear on the predominance inquiry, not ascertainability. Because the class is defined with reference to objective criteria, and UPS's timekeeping records provide a reliable and administratively feasible mechanism for determining who falls within the class, the class is ascertainable.

### C.    Numerosity

While there is no minimum number of plaintiffs necessary to sustain a class action, courts generally find that if the number of potential plaintiffs exceeds 40, then numerosity is met. *Marcus*, 687 F.3d at 595. During the first round of briefing on class certification,

---

[8]    Indeed, GTWOR covers airline personnel whose jobs include Line Maintenance Mechanic and Maintenance Utility, and "AIS is the system in which automotive employees enter their timecards." (ECF No. 113-32 at ¶ 37.) And Plaintiffs do not contend that drivers, driver's helpers, or automobile mechanics are members of the Proposed Class.

Plaintiffs came forward with evidence that there are approximately 17,000 employees in the putative class. (*See, e.g.*, ECF No. 37-1 at ¶ 7.) Since then, Plaintiffs have revised the class definition to exclude employees who entered into arbitration agreements with UPS. Presumably, the putative class is smaller now. However, UPS's Counsel acknowledged in a prior hearing that Plaintiffs could still satisfy the numerosity requirement even after removing employees subject to arbitration. (*See* ECF No. 70 at 33:6-15.) While the Plaintiffs have not identified the precise number of potential class members at issue, UPS has not contested numerosity. And given the fact that Plaintiffs seek to represent a class of warehouse employees who worked across ten facilities over the past seven years, I have little trouble concluding that the universe of employees is sufficiently numerous to warrant class treatment.[9]

### D.    Commonality

Commonality requires a showing that "there are questions of law or fact common the class." Fed. R. Civ. P. 23(a)(2). The bar for commonality is "not a high one." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quotation omitted). When the "defendant's conduct is common as to all of the class members[,]" the standard is met. *Id.* (quotation omitted). The proposed class's claim "must depend on a common contention"

---

[9]    In its opposition, UPS contends that "[o]ver the class period, UPS has employed more than 100,000 hourly workers at the Facilities ...." (ECF No. 108 at 4.)

whereby "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

Commonality is apparent in this case because there are common questions of whether time spent (1) walking through the Plissken Facilities' guard shacks and (2) walking from the employee entrance to the nearest time clock and back again is compensable under the PMWA. Indeed, UPS has a common policy across the Plissken Facilities that requires its employees to walk through the guard shack before entering the warehouse. In fact, UPS identified the Plissken Facilities at issue because each of those facilities has a guard shack where staffed security guards screened employees. That the security screenings in each guard shack may vary from facility to facility does not defeat commonality because UPS requires *all* the members of the Proposed Class to go through the guard shacks before entering the building. Indeed, even if little to no screening occurs, it doesn't change the fact that the Proposed Class Members *must* walk through the guard shack before they can enter the actual facility. In other words, UPS requires them to be there. Thus, any differentiation between the security procedures at the various guard shacks will bear on damages, not liability.

Also, Plaintiffs have made clear that they seek to recover unpaid wages only for "the time it takes to walk the most direct, shortest distance between the security check and their reporting areas." (ECF No. 105 at 1.) And following class certification, Plaintiffs' expert(s) will measure and calculate the shortest walking routes at each UPS location.

Thus, Plaintiffs will have common evidence of the walk times at each Plissken Facility. Plaintiffs' decision to rely on the shortest routes (as opposed to the actual routes each employee may have taken) obviates any concern that their calculations would include time employees may have spent socializing before or after their shifts.

Finally, I do not think that employees' use of cellphones for personal reasons during their walks between the building entrance and their reporting areas (and vice versa) poses a commonality problem. As I indicated during the hearing on Plaintiffs' motion, I am skeptical that UPS will prevail on its theory that it does not have to compensate its warehouse employees if they use their phones during this walking time.[10] In *Heimbach*, the Supreme Court of Pennsylvania rejected a nearly-identical argument—*i.e.*, that walking to a reporting station while using a cellphone is not compensable under the PMWA because the employees "are not performing work-related things[.]" (Tr. 102:14-15.) As the Supreme Court noted, this interpretation of the PMWA is "unfounded and unreasonably constrained" as the PMWA "specifically designates *all* 'time during which an employee is required by the employer to be on the premises of the employer' as compensable hours worked, ***regardless of whether the employee is actually performing job-related duties*** while on the premises." *In re Amazon.com, Inc.*, 255 A.3d 191, 204 (Pa. 2021) ("*Heimbach*") (emphasis added). In addition, I am hard-pressed to

---

[10]    Because this issue bears on class certification, and I must engage in a rigorous analysis of both factual and legal allegations, it is proper for me to conduct a "preliminary inquiry into the merits" of this argument. *Hydrogen Peroxide*, 552 F.3d at 317.

conclude that an employee's use of a phone converts this walking time to "time spent on the premises of the employer for the convenience of the employee," 34 Pa. Code § 231.1(b), where UPS requires every employee to walk to their reporting station. Thus, these issues do not preclude a finding of commonality.

### E.    Typicality

For class certification, a plaintiff's claims must be typical of those of other class members. Fed. R. Civ. P. 23(a)(3). Again, the Third Circuit has "set a low threshold" for satisfying the typicality requirement. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). That requirement "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus*, 687 F.3d at 598. "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*; *see also Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). In short, the typicality requirement does not "mandate[] that all putative class members share identical claims." *Newton*, 259 F.3d at 183 (quotation omitted).

In this case, Plaintiffs' claims are typical because they arise from the same legal theories as the claims of the class: UPS violated the PMWA by (1) failing to pay its warehouse workers for time spent going through security screenings (prior to December

5, 2021) and (2) failing to pay warehouse workers for time spent walking the shortest distance between the facility entrance and their reporting areas before and after their shifts. Indeed, Plaintiffs work in UPS's warehouses, and UPS did not pay any of them for the time they spent engaged in these activities. Because their legal claims share their origins with the Proposed Class's claims, "even relatively pronounced factual differences" between their situation and other proposed class members don't disturb a finding of typicality. *Newton*, 259 F.3d at 184 (quotation omitted).

It does not make a difference that Plaintiffs (as union members) may be subject to monetary offsets under the CBA because the injury (as opposed to the amount of damages) is the same. And the MCA defense is not "peculiar" to the named Plaintiffs. Indeed, UPS contends that "roughly 95%" of the Proposed Class Members "are subject to or potentially subject to the MCA exemption." (ECF No. 108 at 1.) Thus, this defense poses no problem for typicality.

### F.    Adequacy

"[T]he representative parties [in a class action must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted). As for

the first consideration, UPS does not contest the adequacy of Plaintiffs' Counsel, and I find Counsel more than adequate.

I also conclude that Plaintiffs are adequate class representatives. A named plaintiff must "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quotation omitted). Thus, this inquiry "focuses primarily on whether the class representatives have conflicts of interest with the putative class members; it does not require that the representatives possess more than 'a minimal degree of knowledge necessary to meet the adequacy standard.'" *Williams v. Sweet Home Healthcare, LLC*, 325 F.R.D. 113, 122 (E.D. Pa. 2018) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)).

Plaintiffs possess the requisite minimal degree of knowledge about the facts of this case, and I do not see a "fundamental" intra-class conflict that would violate Rule 23(a)(4). "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Dewey*, 681 F.3d at 184 (quotation omitted). There is nothing in the record that indicates that part-time supervisors in the class benefited from UPS's failure to pay Plaintiffs for their security screening and walking time. As such, any alleged conflict between Plaintiffs and the part-time supervisors in the class is far too speculative to defeat adequacy.

UPS argues that Plaintiffs are inadequate (and atypical) because they didn't have the same job categories as other class members. But UPS, in the same brief, contends that job categories don't define the work that a particular class member performed. UPS can't have it both ways. And, in any event, none of that changes Plaintiffs' adequacy to litigate about UPS's overtime pay practices (nor does it render them atypical in doing so).

### G.    Predominance

The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156 (3d Cir. 2023) (quotation omitted). The "purpose of Rule 23(b)(3)'s predominance requirement is to determine whether a class action would achieve economies of time, effort, and expense and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness." *Brummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149, 162 (3d Cir. 2025) (cleaned up). By its terms, the predominance requirement "anticipates the existence of individual issues ...." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015).

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*,

577 U.S. 442, 453 (2016) (citation omitted). Rule 23(b)(3) requires that "the common, aggregation-enabling, issues in the case [be] more prevalent **or** important than the non-common, aggregation-defeating, individual issues." *Id.* (citation omitted) (emphasis added). In sum, the inquiry "tests whether [the] proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.*, 521 U.S. at 623 (citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453.

To determine whether common or individual issues predominate, "a district court must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which the plaintiffs propose to use the evidence to prove' those elements." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 128 (3d Cir. 2018). "Showing predominance is difficult, and it 'regularly presents the greatest obstacle to class certification.'" *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024) (quotation omitted). In this instance, Plaintiffs have overcome that hurdle.

As an initial matter, Plaintiffs have demonstrated that they can prove the elements of their claims on a class-wide basis. To prevail on their PMWA claim, Plaintiffs "must

demonstrate that (1) [they] and the other hourly workers were 'employees,' (2) [UPS] was their 'employer,' and (3) [UPS] failed to pay them the wages required by the PMWA." *Malone v. United Parcel Serv., Inc.*, No. 21-cv-3643, 2023 WL 3362588, at *4 (E.D. Pa. May 9, 2023) (quoting *Beauregard v. Broadway Elec. Serv. Corp.*, No. 21-cv-1600, 2022 WL 2293969, at *5 (W.D. Pa. June 24, 2022)). To recover unpaid overtime wages, Plaintiffs must also demonstrate that they worked "forty hours of work in a given workweek as well as some uncompensated time in excess of the forty hours." *Beauregard*, 2022 WL 2293969 at *5. As far as I can tell, there is no dispute that UPS employed Plaintiffs and the Proposed Class Members. There is also no dispute that: (1) prior to December 5, 2021, UPS did not pay employees at the Plissken Facilities for time those employees spent going through security screenings; and (2) UPS does not pay these employees for the time they spend walking between the warehouse entrances and exits and their reporting areas. Assuming some or all of this time is compensable, Plaintiffs can establish the amount of hours they worked and the corresponding wages they are due, using a combination of UPS's timekeeping records and Plaintiffs' expert's analysis.

None of the issues that UPS raises alters this outcome. UPS points out that the different facilities at issue have different security screening protocols. That might be true, but it doesn't alter the common nature of the analysis for all of those facilities. At each facility, an employee had to badge in and out of the security area and then walk to or

from a time clock. The specific security measure that UPS employed doesn't alter, let alone raise dominant individual questions, about UPS's overtime obligations.

UPS also claims that Plaintiffs can't prove their claims with common evidence. Not so. Plaintiffs' focus on the shortest walking distance obviates most of UPS's arguments. For example, it won't matter if a class member stopped in a breakroom, socialized, or otherwise detoured. Plaintiffs' methodology will only account for the minimum time necessary to walk to clock in. Nor does it matter if a class member did something else on that walk because UPS's policy necessitated that walk for everyone. So, the time is either compensable or not, even if some class members multitasked while doing what UPS required them to do.

Finally, and most significantly, UPS contends that its MCA defense—and the individualized issues that it presents—will predominate. "[W]hile it is well established that the existence of a defense potentially implicating different class members differently does not *necessarily* defeat class certification, it is equally well established that courts must consider potential defenses in assessing the predominance requirement[.]" *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) (citations omitted) (original emphasis). Thus, I must also consider whether there is common evidence to establish UPS's affirmative defenses or whether individual issues predominate. *See Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022). There is no dispute that UPS bears the ultimate burden of establishing which, if any, class members are exempt from the PMWA's overtime

requirements. However, at this stage of the case, Plaintiffs must "show that more 'substantial' aspects of this litigation will be susceptible to generalized proof for all class members than any individualized issues." *Myers*, 624 F.3d at 551.

To prevail on its MCA defense (at least as to loaders),[11] UPS must prove that its employees are "loaders" as defined in the MCA. This will require UPS to prove that: (1) its employees perform the type of loading set forth in the MCA's regulations, and (2) identify the employees who engaged in loading or reasonably could have expected to engage in loading. The first inquiry—the "what"—can be answered on a class-wide basis. Questions as to how UPS employees load trucks (whether tractor trailers or package cars), why they load them the way they do, and whether they exercise any discretion when loading can all be answered on a class-wide basis. Indeed, while loading procedures for tractor trailers are different than loading package cars, the loading procedures for each type of vehicle are the same across the Plissken Facilities. UPS conceded that these questions can be resolved as to the entire class.[12]

---

[11]    UPS asserts that drivers, driver's helpers, automobile mechanics, and loaders "constitute approximately 95% of the hourly workforce at the Facilities." (ECF No. 108 at 7.) However, in opposing class certification, UPS focuses its arguments on the issue of loaders. And given the revised class definition, there may not be many drivers, driver's helpers, and automobile mechanics in the Proposed Class in any event.

[12]    At the hearing, UPS's Counsel conceded: "I think the question about whether there is discretion and how this is done, the ways in which it is loaded, I do believe that those are class-wide issues, yes." (Tr. 46:13-16.)

As for the second prong of the MCA showing—the "who"—at least a portion of that question can be answered on a class-wide basis as well. At summary judgment, the Parties can argue about what it means for an employee to reasonably be expected to load, or drive, or work as a driver's helper or mechanic, and I'll have to determine what the relevant test is. But once that test is set, it will apply to everyone in the class. Admittedly, applying that test to the individual employees, and determining who actually engaged in these activities, and how often, is not as straightforward. However, there are at least two reasons why the MCA defense does not defeat class certification at the predominance inquiry.

*First*, UPS's failure to keep complete and/or accurate records about its employees' work activities has exacerbated the individualized nature of the inquiry in this particular case. There is not a single source of information about which employees engaged in MCA exempt activities (or were reasonably likely to) and how often. Plaintiffs point to UPS's scanning data and timekeeping records, but even they acknowledge that this evidence is not perfect. (*See* Tr. 52:12; 92:18-20.) For example, not every scan at a Hub facility can be tied to a specific employee who loaded the package because the scans may have occurred at an automated facility,[13] where the employees do not scan, or employees may have engaged in team-loading or shared scanners. In addition, loaders do not scan packages on the Package side, so there is no way to identify which employees loaded the packages

---

[13]    The Hubs at Middletown, Carlisle, and Bethlehem are fully automated facilities.

onto a truck. This is not surprising because the purpose of scanning packages is to track the packages' whereabouts and delivery status[14]—not track employee work activity. Thus, while the scanning data captures a subset of employees who load in conventional Hubs, it does not identify everyone who loads and how often because that data "is not intended to be employee tracking data[.]" (Tr. 95:2-3.)

Likewise, the employee-tracking data that UPS does have—its timekeeping records—also fails to identify all employees who engaged in MCA-exempt work. Many of UPS's warehouse workers "work as directed" and, therefore, may alternate between jobs, duties, and operations (*e.g.*, Hub to Package) as needed. On the Hub side, UPS's HTM/STMS timekeeping systems identify employees' assigned work areas, one of which is load. However, the HTM/STMS data may paint an incomplete picture of which employees loaded and how often. For example, "Hub employees typically do not update their work job codes from their default role when they move to loading since there is no change in employee pay or other impact on business operations." (ECF No. 110-4 at ¶ 9.) In fact, from UPS's business perspective, "having Hub employees clock-in and clock-out to change their activity code is not time efficient[.]" (*Id.*) Thus, like the package-scanning data, UPS's timekeeping records capture some, but not all, of individual employees' loading activity.[15]

---

[14]    UPS explained that the scanning data is "is purely package tracking data" that UPS uses for "package volume projection." (Tr. 95:3-5.)

[15]    UPS's GTS system presents similar problems on the Package side.

Given all this, it seems clear that there is no generalized source of proof on which UPS can rely to prove which employees are exempt under the MCA. As a result, UPS would need to establish its defense as to each class member on an individual basis, possibly relying on a combination of scanning data, time-keeping records, and individual testimony from employees or supervisors. And even then, some gaps may remain. But this is largely a problem of UPS's own making, and the question becomes what impact that has on class certification. The Third Circuit's *Hargrove* decision answers that question: "where employment records are lacking, the employer and not the employee will bear the cost of such deficiencies." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 483 (3d Cir. 2020).

Admittedly, *Hargrove* dealt with an employer's failure to maintain employee pay records that the law required it to keep, and UPS is under no legal obligation to track which of its employees are covered by the MCA exemption. However, the Third Circuit has since clarified that *Hargrove's* holding is not limited to situations where the defendant failed to keep records as required by law. *See Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 462 n.13 (3d Cir. 2024). That makes sense because the problem that *Hargrove* identifies applies with equal force in this case. Allowing UPS to rely on its own lack of records to thwart Plaintiffs' class action on predominance grounds would "creat[e] an incentive for employers not to keep records and thus avoid potential lawsuits" and would "craft[] a vast loophole to class certification" that "would lead to paradoxical outcomes." *Hargrove*, 974 F.3d at 483.

By incorporating the MCA exemption, the PMWA excuses UPS from having to pay overtime for those employees who fall within that exemption. If UPS wants to take advantage of that exemption—as a matter of law—then it must keep records necessary to determine which employees are exempt. If it doesn't want to keep those records, then it will have difficulty asserting the MCA defense. But that choice cannot thwart Plaintiffs' request for class certification, and *Hargrove* prevents UPS from using its own inadequate record-keeping to transform the MCA exemption from a shield into a sword. Thus, the individual inquiries that may result from UPS's assertion of the MCA defense in this case are not sufficient to defeat class certification.[16]

*Second*, Plaintiffs have demonstrated that the common issues in this case are far more important than the individual ones. There is no question that I can resolve the central question of whether Warehouse Workers' time spent going through security and walking to and from their reporting areas is compensable time under the PMWA on a class-wide basis. And assuming that some or all of that time is compensable, Plaintiffs have demonstrated that they can establish the elements of their claim with common evidence. In addition, there is no dispute that a significant portion of UPS's MCA defense can also be resolved on a class-wide basis.

---

[16]    "[T]he issues that most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts." *Anderson Living Tr. v. ConocoPhillips Co., LLC*, 349 F.R.D. 365, 425 (D.N.M. 2025).

All that remains with respect to the MCA defense will be determining precisely who, if anyone, engaged in MCA-exempt work and how much. And how much time employees spent engaged in these activities is akin to a damages analysis, something that will not defeat predominance. *See Tyson Foods*, 577 U.S. at 453 (explaining that "other important matters" like damages can be tried separately). In the grand scheme of this case, determining the "who" aspect of the MCA inquiry—even if it does involve individualized factual inquiries—is not sufficient to overcome the many other questions that can be resolved on a class-wide basis. In short, these individual issues are not sufficient to defeat certification because they do not "tip" the balance such that these individual issues predominate. *Sykes*, 780 F.3d at 87. Thus, predominance is satisfied.

### H.    Superiority

Plaintiffs must show that class litigation is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To make this determination, I must consider four factors: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(A) – (D). The superiority requirement requires me to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available

methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533–34 (3d Cir. 2004). On the whole, I find that the balance tips in favor of adjudicating these claims on a class-wide basis.

In a similar case involving the compensability of employee walking time in a large warehouse setting, Judge Murphy determined that class action treatment was superior to the alternative, given the large class size, the modest individual claims, and the largely unifying legal issues. *See Davis v. Target Corp.*, No. 23-cv-89, 2023 WL 8373162, at *6 (E.D. Pa. Dec. 1, 2023). Those same factors all weigh in favor of adjudicating this case as a class action, particularly where the proposed class may be even larger. And given how long the Parties have litigated the case in this forum, it would make little sense for them to pursue their claims and defenses elsewhere.

Indeed, UPS does not contest superiority. Instead, it asserts that if predominance is not established, then superiority should fail as well. However, I have determined that common issues predominate in this case, and the individual issues that arise from the MCA do not defeat superiority for the same reasons they do not defeat predominance. Thus, superiority is met.

## I. Notice

Finally, as I indicated during the hearing on the motion for class certification, UPS did not mount a meaningful challenge to Plaintiffs' proposed class notice. Just asserting that the proposal is overbroad and misleading is insufficient. However, rather than treat

the notice as unopposed, I will decline to rule on the proposal now. That seems the more prudent course, given my revision to the class definition. And those changes may impact the time needed to identify and notify class members. Thus, I will provide additional time for Plaintiffs to submit a revised proposal and for the Parties to address any issues that they cannot resolve among themselves.

## IV.    CONCLUSION

UPS's assertion of the MCA defense has held up class certification for nearly two years. But it turns out that the defense, even if it does raise some individual issues, is not significant enough to defeat class certification. Instead, Plaintiffs have satisfied Rule 23's elements by a preponderance of the evidence, and I will certify a class. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

December 12, 2025